## ALBERT C. HEATH v. MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE RAILWAY COMPANY and Another.[1]

July 18, 1914.

Nos. 18,691—(217).

**Injunction — continuing trespass.**
1. The defendants so constructed and maintained an embankment on their right of way that at every heavy rainfall destructive quantities of

[1] Reported in 148 N. W. 311.

Note.—The question of injunction against continuing trespasses is discussed in notes in 13 L.R.A.(N.S.) 173 and 21 L.R.A.(N.S.) 417.

sand and material therefrom were cast upon the adjoining land of plaintiff. This constituted a continuing trespass and nuisance entitling plaintiff to an injunction and damages.

**Measure of damages.**

2. It clearly appeared from the evidence that the expense of removing the sand was much less than the diminution in the market value of the land, if the sand and existing conditions were allowed to remain. Such being the case, the lesser amount was the proper sum to award as damages.

**Findings sustained by evidence.**

3. Certain findings, in so far as material, are sustained by the evidence except as to the extent of $200 included in the damages allowed.

Action in the district court for Washington county against two railway companies. The case was tried before Stolberg, J., who made findings, and a jury to which was submitted the question of . damages only, which returned a verdict for $3,500 in favor of plaintiff. From an order denying their motion for judgment notwithstanding the verdict or for a new trial and denying their motion to strike out the findings of fact, defendants appealed. Affirmed, on condition plaintiff consent to a reduction of the verdict to $3,300.

*A. H. Bright, Kenneth Taylor* and *Manwaring & Sullivan,* for appellants.

*Butler & Mitchell,* for respondent.

HOLT, J.

This is an action to enjoin defendants from casting sand upon plaintiff's land, and for damages for the injury already inflicted because of a deposit of sand thereon. Plaintiff prevailed, and defendants appeal from the order denying their alternative motion for a judgment or a new trial.

The defendants' right of way, where it crosses St. Croix river, runs east and west and occupies a strip off of the northerly boundary of government lot 3 in section 1 of township 30, range 20 west. In the spring of 1911, after defendants had acquired the right of way and constructed a high embankment thereon for their road bed, plaintiff bought the remainder of the lot from the same person who had conveyed the right of way to defendants. Plaintiff's land is

bounded on the east by St. Croix river, towards which it slopes. A ravine or depression exists in the northwest corner, which runs northeasterly until it strikes the right of way, about where an abandoned right of way crosses the present, thence it turns southeasterly and spreads out into a valley. In this valley are two spring-fed rivulets which unite and, passing along, discharge into a bay of the river in the southeasterly part of the lot. The land is adapted for a summer residence because of its attractive location and also, on account of the springs, available for keeping and propagating brook trout. Plaintiff bought it for these purposes, erected a dwelling house, and built concrete dams in the rivulets and springs wherein to keep the trout. Because of the nature of the ground defendants were compelled to make a cut some 4,000 feet in length immediately west of plaintiff's land. This cut is, at places, over 150 feet in width and some 40 feet in depth, sloping east. Over lot 3 the defendants' track is, for the greater part, laid upon immense fills; and the balance is upon trestle. The result was that a large quantity of water from the drainage basin caused by the cut flowed down upon plaintiff's land and, in discharging through a culvert placed in the ravine where it crossed the abandoned right of way, it struck the toe of the large fill, carrying away great quantities of sand down into the springs and rivulets mentioned, almost entirely filling the trout dams and burying the trout. As the sand was thus torn loose from the fill, more was dumped in. Experts testified that from 2,000 to 2,200 cubic yards of sand were deposited upon plaintiff's premises, and that the value of removing the same was $1.50 per cubic yard. One question was submitted to a jury for determination, namely: "In what amount has the property of the plaintiff described in the complaint been damaged by the deposit and casting thereon of sand and loose material from the embankment of the defendants?" And the answer was: "In the sum of $3,500." The court embodied the verdict in the findings, granted the injunction asked and awarded damages in the sum named.

The first proposition, which naturally presents itself, is whether the plaintiff was entitled to an injunction. It is contended by appellants that its embankment and fill was constructed when plain-

tiff bought; that the right of action because of faulty construction had accrued and vested in plaintiff's grantor and did not pass with the deed; that the embankment or fill was a permanent injury and the deposit of sand afterwards was a mere natural result of surface water washing against and flowing over the fill; and that this would take place was perfectly obvious when plaintiff bought, and naturally the purchase price was reduced accordingly. In short, it is claimed that the construction of the road bed was a permanent injury to this lot 3 for which damages accrued to the then owner, plaintiff's grantor. We are cited to cases like Karst v. St. Paul, Stillwater & Taylor's Falls R. Co. 22 Minn. 118; Ziebarth v. Nye, 42 Minn. 541, 44 N. W. 1027; Evans v. Northern Pac. Ry. Co. 117 Minn. 4, 134 N. W. 294; Milwaukee & N. Ry. Co. v. Strange, 63 Wis. 178, 23 N. W. 432; Toledo, W. & W. Ry. Co. v. Morgan, 72 Ill. 155; Arterburn v. Beard, 86 Neb. 733, 126 N. W. 379; Kindred v. Union Pac. R. Co. 225 U. S. 582, 32 Sup. Ct. 780, 56 L. ed. 1216; Louisville & N. Ry. Co. v. Lambert, 33 Ky. Law Rep. 199, and others. In some of these cases the injury grew out of the erection of a permanent structure upon land other than complainant's but which depreciated the value or use of his; and in others, improvements of a permanent character had been erected by the defendant on his own property which diverted surface waters, or a watercourse, before the complainant acquired the property claimed to be injuriously affected; and again in others, where land was conveyed with a railway upon it, so that it was held that the grantee took subject to an easement. Of course if damages have been recovered for present and prospective injuries to land, no injunction will issue to abate that which is included in the recovery, and it also follows that, if the construction of the railroad embankment was a permanent injury to lot 3 when owned by plaintiff's grantor, he is the one entitled to damages, and plaintiff can have neither injunction nor damages. But we think defendants' position is not sound. They owned the right of way and had a perfect right to make cuts and fills so long as these were confined to their own premises, and could heap up any quantities of sand or other material thereon, provided no part thereof was cast upon plaintiff's land. Gen-

erally speaking, surface water is a common enemy which every proprietor may protect himself against, and, unless collected on one's own premises and discharged in destructive quantities upon a neighbor's, there is no liability. But not so with rocks, sand or improvements placed on land. These must be so placed as not to fall upon the adjacent land of another. If sand is so piled on one's own land that every rain continues to wash part of it down upon the premises of a neighbor, it constitutes a nuisance, it obstructs the free use of his property so as to interfere with his comfortable enjoyment thereof, and he is entitled to an injunction and damages. Section 8085, G. S. 1913. No sand escaped from defendants' works until after plaintiff purchased. However, some time thereafter, when heavy rains set in, it clearly appeared that, with the cut, old roadway and culvert in the condition constructed and maintained by defendants, every subsequent heavy rain would cause a new deposit of sand upon plaintiff's land and a corresponding erosion of the embankment, which would have to be again replenished by defendants. The trespass was a continuing one within the case of Bowers v. Mississippi & R. R. Boom Co. 78 Minn. 398, 81 N. W. 208, 79 Am. St. 395, wherein Chief Justice Start states: "The test, whether an injury to real estate by the wrongful act of another is permanent in the sense of permitting a recovery of prospective damages therefor, is not necessarily the character, as to permanency, of the structure or obstruction causing the injury, but the test is whether the whole injury results from the original wrongful act, or from the wrongful continuance of the state of facts produced by such act." 2 Dunnell, Minn. Dig. § 4476. The evidence suggests that future injury is preventable. That the embankment was constructed in the usual way does not signify. The gist of the complaint against defendants is that they so arranged their materials upon the right of way that they continuously escape and fall upon plaintiff's land. Unless defendants have taken steps to avoid a recurrence, it is plain that were the springs and ponds of plaintiff now emptied of the sand, which came from defendants' embankment, they will again be filled at the next heavy rain. If defendants need plaintiff's premises, or any part thereof, as support for their road bed, the same must be

·taken under the eminent domain statute.  The invasion of plaintiff's premises was in the nature of separate, recurring acts of trespass.

As to the damages.  The rental value is not always the measure ·of damages for continuing trespass.  Other elements may enter. Such are cases where the owner has not only been deprived of the use ·of the premises, but such acts have been committed thereon by the wrongdoer that to restore the same to the original condition requires labor and expense.  The rental value plus the cost of restoration is the true measure of damages, in cases of continuing trespass, when it appears that this is less than the difference between the value of the premises before and immediately after the wrong.  And this was the tenor of the court's charge as appears from this paragraph: "If you believe that the sand and gravel now upon the plaintiff's premises came from the defendants' property, and can be removed and the plaintiff's property restored for a less sum than the amount ·of damage which would result from leaving such sand and gravel thereon, your verdict should be for the lesser amount."  The only ·evidence of the difference in value of plaintiff's land before and after the wrong, or rather of permanent injury, was that given by plaintiff who stated it to be $9,500.  He also by experts showed that 2,000 ·to 2,200 cubic yards of sand had been deposited on his premises and ·that this could be removed at a cost of $1.50 per cubic yard.  Some ·evidence was also adduced as to probable profits from trout raising. The defendants did not contradict or question this testimony of values in any manner except by cross-examination.  Upon this state ·of the record, we do not think the defendants can urge prejudicial error for refusing to instruct as requested by them:  "That in de-termining the question submitted to you, you are to find what was ·the difference between the fair market value of the land described in plaintiff's complaint immediately before the injury was com-mitted, and its fair market value immediately after."  The court's general instructions were in accord with the rule announced in Os-born v. Mississippi & R. R. Boom Co. 95 Minn. 149, 103 N. W. ·879.  When plaintiff gave his opinion as to permanent damages, no intimation had been given by the court that the jury should be con-fined to a determination of the cost of restoration plus incidental

matters, nor did the court in the charge so limit the jury, unless they should find that this would mean a smaller recovery than the difference in value of the land before and after the injury. It should be noted also that the uncontradicted evidence showed that restoration was so very much less than the damages measured by the general rule that it cannot be held error for the court to dwell upon that feature in the charge.

The claim is made that no proper allowance was made for the sand and loose material which was washed down and did not come from the embankment, also that it is not probable that all the sand deposited in the ravine would need to be taken away in order to make the property as available for trout purposes as it was before the injury. As to the first, the evidence is not sufficient to show an appreciable filling from any other source than the embankment on the new right of way, and as to the second there is really no evidence upon which to make the claim. If plaintiff is entitled to restoration as being the lesser damages he should have full restoration, and not partial, regardless of the use to which he may afterwards put the property.

Certain findings are assailed as not supported. The material findings are justified by the evidence. The findings deemed immaterial are to the effect that the embankment is constructed in the usual manner, that it is practical to prevent further depredations from escaping sand, and that the sand had been negligently cast upon plaintiff's premises. Plaintiff was entitled to have the nuisance abated and to be made whole, without regard to how the sand escaped from defendants' right of way.

It may be conceded that since the question of damages was submitted to a jury it was unnecessary, if not improper, for the court to find on that subject, except to embrace or adopt the verdict. The court found that the permanent maintenance of existing conditions as to embankments and culverts by defendants will diminish the value of plaintiff's property in the sum of $9,000. However, we think this finding aids the defendants on this appeal. For therefrom it is made to appear that the jury must have confined damages to the cost of restoration and incidentals, such as killing the trout, fill-

ing the water pipes with sand so that they froze, and the diminished rental value while the brook was rendered useless, because these are so much smaller than the damages under the general rule would have been. The court also found that the cost of removing the sand deposited would be $3,300. As already noticed the evidence sustains this finding. So that it becomes necessary to ascertain whether there is any evidence to warrant the recovery of the additional $200 in the verdict, which represents the incidental damages such as loss of trout, freezing of the water pipes and value of the use of the springs and dams during the time he had been deprived thereof. We fail to find any evidence which gave the jury a basis for including any amount for these incidentals. Nor should interest be assumed to be included in the verdict under the instructions. To the extent of $200 we consider the damages not proven.

The order appealed from is affirmed, on condition that plaintiff, within 10 days after remittitur goes down, file in the court below a consent to a reduction of the verdict to $3,300. In case such consent is not filed, a new trial is granted.