# CARL OPTEN v. PRUDENTIAL INSURANCE COMPANY OF AMERICA.[1]

June 7, 1935.

No. 30,370.

[1]Reported in 261 N. W. 197.

*Shearer, Byard & Trogner,* for appellant.
*Keyes, Pardee & Solether,* for respondent..

JULIUS J. OLSON, JUSTICE.

Plaintiff brought this action to recover upon two policies of life insurance issued by the defendant to him. As plaintiff is of unsound mind, the action was brought in his behalf by his general guardian. Two causes of action were pleaded in the complaint. In the first cause plaintiff sought to recover certain monthly disability benefits accruing to the time of trial; also recovery was sought of insurance premiums paid by his guardian, upon the theory that under the policy contract premiums should not be required of him while totally disabled. In the second cause the same result was sought and obtained; the only difference related to the amounts recoverable as disability benefits and of premiums alleged to have been wrongfully exacted. In each of the policies the following provision appears:

"The insured, upon demand by the company at any time during such disability and before the company's liability hereunder has ceased, shall furnish due proof that he actually continues in a state of disability, as defined above, and in case of his failure so to do the insured shall be deemed to have recovered from such state of disability."

In September, 1923, the insured was adjudged insane and committed to the state hospital at Rochester and was later removed to the Anoka hospital. From the latter place he escaped August 4, 1929. Since then no one has heard anything of him. His guardian did not learn of his escape until about November 1, 1929, and defendant was not informed thereof until February 9, 1930. From the time of his original commitment and until March 15, 1930, defendant paid the disability benefits provided by the terms of the respective policies, the payments being made to the guardian. During this period no premiums were paid nor required. Defendant, upon

being informed of the insured's escape from the asylum, notified the guardian that it required proof that the insured actually continued in a state of disability and also asked to be informed of his whereabouts. No proof was furnished. By reason thereof defendant discontinued disability benefit payments and insisted that both policies should be returned to a premium-paying basis.

At the trial it was shown that the insured's physical condition when he escaped from the hospital was good, and the court so found. His mental condition had not improved. As a matter of fact, the evidence amply warrants the conclusion of the trial court that the insured's affliction (dementia praecox of the catatonic type) is regarded as almost hopeless, the recoveries in such cases being only from one to two per cent. He was 39 years of age at the time of his escape, his normal expectancy 28.9 years. There is evidence by competent experts that one suffering with this form of insanity, when in a suitable institution for such sufferers, is likely to outlive a "normal person outside."

Dr. Caine, superintendent of the Anoka hospital, testified amongst other things as follows:

A. "In my judgment he was insane.

Q. "What type of insanity was it?

A. "His case was one of dementia praecox.

Q. "Was there any special type of that disease that he had?

A. "There are various types. His was what is called catatonic or a condition with the motor symptoms predominating.

Q. "By motor symptoms you mean the nervous system that controls the muscles?

A. "Yes. He didn't have absolute control of the muscles at times. He had acute maniacal spells at times and was hard to control at those times."

And further, respecting plaintiff's condition:

A. "He had frequent attacks of maniacal trouble. He would be very violent and would either attempt to run away or attack others whom he thought were persecuting him. And he heard things that didn't exist. He would hear people, and he would start out to do

his work and he might wind up in some entirely different place. You could not depend upon him, and he had to be under constant supervision there. He would do work between these attacks, but some one had to be near to see that he didn't wander off or do things that he shouldn't do.

Q. "State whether or not that type of insanity is considered progressive.

A. "As a rule this type is progressive. They gradually become worse."

Respecting plaintiff's expectancy where there is change of environment from an institution of the nature conducted by the state and where one is left to roam on the outside, the doctor testified:

A. "I would say his expectancy would be less if he were outside than it would be were he confined in an institution.

Q. "And the probable expectancy of life in cases of this kind depends a good deal, does it not, on the environment of the patient?

A. "I think it does to a degree.

Q. "And the care that he gets and his freedom from responsibility, etc.?

A. "I think that is correct.

Q. "And if those are absent they have a very marked tendency to shorten the life of the patient?

A. "I didn't get that last question.

Q. "I say if those features of environment are absent they have a great tendency to shorten the life expectancy of a patient?

A. "Yes, sir, I think so."

The trial court found for plaintiff and ordered judgment in his behalf in the amount of $948.64, consisting of premiums paid by the guardian after March 15, 1930, with interest from the various dates of payment, and the monthly disability instalments until the time of trial. The court found that the insured was living at the time of the trial; that he was and at all times since his escape had been totally incapacitated; further, that ever since his escape from the hospital his guardian "has been unable to furnish defendant with information as to the whereabouts of said Carl Opten." With re-

gard to defendant's demand that it be afforded opportunity to examine the person of the insured or that proof of actual disability still existed as prerequisite of further payments of disability benefits, the court was of opinion that such were unreasonable requirements and would "definitely curb and limit coverage on the policy. Disability from any cause whatsoever is covered in the policy, and there is no limitation on the coverage where total disability results. Consequently it is not a reasonable requisite, in the court's opinion, to require the opportunity to examine the person of the insured where the insured has escaped from an insane asylum while in a condition of total disability." Lastly, so concluded the court, "it must be borne in mind that the supreme court of Minnesota has definitely adhered to the so-called liberal rule of construction in policies of this type."

By their contract the parties agreed that in the event (1) plaintiff should become disabled (as defined in and limited by the policy) while the insurance was in full force and would furnish defendant due proof in that regard, it would pay him during the continuance of such disability stipulated monthly sums; also, that it would waive premium payments during such incapacity; and (2) if the insured should die while the insurance was in force, it would pay as a death claim a stipulated amount. Only the first contingency is involved now, and to this respective counsel have directed their attention. But it is essential that we keep in mind these dual provisions because, under the former, existence of life and continuance of disability are as essential prerequisites to recovery as is death under the latter. Before liability of this nature can be imposed upon defendant, so the parties agreed, the insured must, upon demand, furnish *"due proof that he* [the insured] *actually continues in a state of disability."* (Italics ours.) Plaintiff's sole reliance for recovery is based upon the presumption that as he was in good physical health when he escaped from the asylum and was insane at that time, therefore these conditions continued and as such support the recovery sought and secured below. It seems rather a strange situation that we have here a plaintiff whose guardian does not know whether his ward is in fact alive and so must rely upon

a mere presumption to prove that essential fact. If the presumption relied upon is not available, there is nothing left. There is then not even a shadow, the substance having disappeared. If plaintiff is in fact dead, his guardian is attempting to act for a corpse. The office of guardian necessarily depends upon the physical existence of his ward. "The relation of guardian and ward is necessarily terminated by the death of either the guardian or the ward." 12 R. C. L. p. 1117, § 19. After such termination of the guardianship the exercise of authority by the guardian "would be unauthorized and void," except to "account and turn over the property" in the guardian's hands to the proper person. *Id.* p. 1118.

Counsel's diligence has been barren of results in their endeavor to find a case at all similar to the one here for review. Perhaps dearth of decision is due to lack of merit in such situation as we find here. If plaintiff had become incapacitated physically instead of mentally, no one suspects that an action such as this would lie by or for him upon his disappearance. The guardian can have no other or greater right than that possessed by the insured for whom alone he is acting. The action is not that of the guardian as an individual but belongs to and is the property of the insured. The cause is personal to him and arises and exists by virtue only of his own contract. Were we to permit recovery and if it should appear later that the insured died shortly after his escape or that he recovered his mental equilibrium, it is obvious that a gross injury would be done to the insurer. We think that upon the present state of facts no recovery can be permitted. It is equally obvious that what is here determined must be without prejudice to plaintiff's rights if and when adequate proof is available.

The question for decision is not whether we construe the insurance contract with strictness or with liberality. This court, in conformity with the practically uniform holding of courts everywhere, is committed to the rule that where "there is no ambiguity in the provisions under consideration, there is no occasion for resort to the familiar principle that equivocal words should be construed against the insurer. While it is highly important that ambiguous clauses should not be permitted to serve as traps for policyholders,

it is equally important, to the insured as well as to the insurer, that the provisions of insurance policies which are clearly and definitely set forth in appropriate language, and upon which the calculations of the company are based, should be maintained unimpaired by loose and ill-considered interpretations." Williams v. Union Cent. L. Ins. Co. 291 U. S. 170, 180, 54 S. Ct. 348, 352, 78 L. ed. 711, 718, 92 A. L. R. 693.

Tested as above outlined, the language here used necessarily required plaintiff to make "due proof that he actually continues in a state of disability." That language is free from doubt. "Actual" disability is the test, not "presumptive" or "probable" disability. As actual disability is required, necessarily proof of actual physical existence of plaintiff is a prerequisite to recovery. Garbush v. Order of U. C. T. 173 Minn. 191, 217 N. W. 123, is not out of harmony with the views herein expressed.

Judgment reversed.

I. M. OLSEN, JUSTICE, took no part.

